508 P.2d 1186

**SPANISH FORK PACKING COMPANY, a Utah corporation, Plaintiff and Appellant,**

v.

**HOUSE OF FINE MEATS, INC., a Utah corporation, Defendant and Respondent.**

No. 13016.

Supreme Court of Utah.

April 19, 1973.

---

1. Title 76–38–12, Utah Code Annotated 1953.

Grant S. Kesler of Morgan, Scalley, Lunt & Kesler, Salt Lake City, for plaintiff and appellant.

J. Robert Bullock of Aldrich, Bullock & Nelson, Provo, for defendant and respondent.

CALLISTER, Chief Justice.

Plaintiff initiated this action to recover a sum defendant owed on an open account for the purchase of meat and meat products. Plaintiff asserted in its pleadings that the purchases were evidenced by seven invoices attached to the complaint; that the invoices provided that plaintiff was entitled to a reasonable attorney's fee, and that a reasonable fee was $1,070.50. The trial court granted plaintiff partial summary judgment for the amount defendant conceded that it owed on the open account. This issue of whether defendant was contractually obligated to pay attorney's fees was reserved for trial. Upon trial before the court, judgment was rendered decreeing that plaintiff's claim for attorney's fees was denied. Plaintiff appeals therefrom.

Defendant was incorporated in August of 1971, previously it had been operated as a sole proprietorship by its president, Donald K. Murphey, who had previously purchased meat from plaintiff. During a time period from October 28 to November 29, 1971, defendant made purchases of meat

on seven occasions; this action was for the purpose of collecting the unpaid balance.

Plaintiff's president, Meyrick, testified that its customary way of conducting transactions was to have one of its salesmen call on a customer and take an order for meat. The meat was subsequently delivered, at which time the customer signed an invoice. The agent of plaintiff would leave a duplicate with the customer and return the original to plaintiff. Plaintiff's president testified that he had never discussed with any representative of defendant the matters of payment of counsel fees, interest, or the time in which plaintiff expected the bill to be paid. He testified that the terms and conditions of the purchase are handled by salesmen and that he had no knowledge of what the salesmen said at the time they took the order.

The president of defendant, Murphey, testified that he had never read the invoice. He testified that most of the meat was ordered by him or defendant's secretary, Horlacher, by telephoning Gary Jensen, one of plaintiff's salesmen. Defendant's president testified that he did not recall discussing any terms or conditions of the sale, including interest rates or attorney fees. He stated that he had never authorized any agent or employee to agree to pay attorney's fees or interest on unpaid accounts. He further testified that when plaintiff's drivers delivered the meat, they did not request anyone in particular to sign the invoice and that whoever was closest to the door signed the invoice acknowledging receipt of the meat.

Based on the foregoing, the trial court found that at no time before the sale or delivery of any meat was the matter of attorney fees or interest raised or discussed by either party; that upon delivery of the meat, nothing was said by plaintiff's agents or defendant's employees regarding attorney fees or interest; that there was no evidence that any employee had actual or implied authority to bind defendant to pay attorney fees or interest; and that the signatures or initials on the invoices were intended to be nothing more than an acknowledgment of the receipt of the products delivered.

The invoices contained in small print, the following statement:

Purchaser agrees to pay for the below merchandise on the First Monday following date of purchase. A finance Charge of 1% per month (Annual Percentage Rate 12%) will be made on all past due balances. Purchaser agrees to pay attorney fees, legal costs, and all expenses involved in the event legal action is necessary for the collection of this invoice . . .

On appeal, plaintiff characterizes these invoices as contracts between the parties and asserts that defendant is bound thereby to pay reasonable attorney fees. Under

plaintiff's theory there was no contract and no obligation upon defendant's part to pay even after delivery, until the moment when by initial or signature defendant's employees expressed defendant's assent to be bound by the terms and conditions expressed in the invoice. Plaintiff contends that defendant by its conduct ratified the alleged unauthorized conduct of defendant's employees of entering into contracts on defendant's behalf. Plaintiff urges that it was incumbent upon defendant to repudiate promptly the acts of its employees, and its silence constituted a ratification.

The issues of the instant action were raised in the recent case of B & R Supply Company v. Bringhurst.[1] This court stated that it was appropriate to apply basic principles of contract law, namely, the creation of a contract requires a meeting of the minds of the parties; and the burden of so proving is upon the party who claims there was a contract. This court observed that the evidence indicated that the defendant had never authorized any of the persons who signed the invoices to contract on its behalf other than as an open account. This court stated:

> There is no affirmative showing to the contrary, nor that any contractual terms or conditions on the invoices were called to their attention, nor that they were aware of them, nor that they did anything other than to initial the invoices acknowledging the receipt of the merchandise. Under those circumstances we can see no basis for a conclusion that the defendant entered a contract to pay attorney's fees.

This court further observed in footnote 4 at page 1218 of 503 P.2d that if one ordered merchandise, which was agreed to be delivered for a requested price, that would be the extent of both the contract and the purchaser's obligation. If upon receipt of the merchandise, the invoice or delivery slip, the purchaser signed, purported to impose further conditions or convenants, a serious question would arise as to the question of whether there was any consideration for such further obligation.

In the instant action, the factual issue before the trial court was, in effect, what were the terms and conditions of the contract between the parties? Based upon substantial competent evidence, the trial court rejected the invoice as evidencing the terms and conditions mutually agreed upon by the parties. The judgment of the trial court is affirmed. Costs are awarded to defendant.

ELLETT, CROCKETT and TUCKETT, JJ., concur.

1. 28 Utah 2d 442, 503 P.2d 1216, 1217 (1972).

HENRIOD, Justice (dissenting).

I respectfully dissent. I am satisfied that the admitted facts in this case bring it within the decision of Slim Olson v. Winegar,[1] and the principles mentioned therein as reflected in the authorities there cited.[2] Concededly, it is difficult to distinguish the instant case from our recent case of B & R Supply v. Bringhurst,[3] relied on by respondent, in which this author concurred,—in retrospect perhaps mistakenly. But there is a distinction, be it ever so humble. In that case, in applying "elemental principles of contract law" we said "the creation of a contract requires a meeting of the minds,"—which is a generally accepted principle in most cases,— except, perhaps, in cases involving liability by express or implied authority, ratification after the fact, and the like, where obviously there is no meeting of the minds of the principals to a contract, save for employment of the alter ego concept, which simply is a convenient fiction. The instant case is that type, where actually there is no meeting of the minds, but where there is a manifestation of mutual assent which appears to create consensual liability by virtue of a sort of estoppel that says one is bound if ostensibly he represents something without affirmatively denying liability therefor,— that he will respond ex contractu, if one relies on his representations, either by express authority or by implication. I think this is that kind of case,—such as the Slim Olson case. I think the latter should be dispositive here, else it expressly should be overruled.

One of the factors in the B & R case opinion was the circumstance that "the conditions of the invoice [were] aptly described by the defendants as 'small inconspicuous print.'" In this statement we may have erred, since the small print in that case was not nearly as small as other contracts universally used by finance companies, banks, appliance companies and others. The problem there really was not "fine print," but "ostensible authority", which is not necessarily destroyed by "fine print." If it could be, then not only "ostensible" authority would not bind a principal, but by the same token the principal himself could relieve himself of liability by simply saying he did not read or deliberately ignored fine print. It is to be noted, significantly, that in the instant case, involving, concededly, only a few invoices, two of which actually were signed

---

1. 122 Utah 80, 246 P.2d 608 (1952).

2. Williston Contracts, Rev. ed., Sec. 90A, p. 257, et seq.; Contracts Restatement, sec. 70; Agency Restatement, sec. 94, p.

234; Moses v. McFarland, 119 Utah 602, 230 P.2d 571 (1951).

3. Case No. 12805, this Court, 28 Utah 2d 442, 503 P.2d 1216 (1972).

by an officer of the company, the evidence shows the use of these invoices in sales by the plaintiff and purchases by the defendant in a continued business relationship over a period of two years. It is somewhat ridiculous to conclude that the purchaser-defendant's officials did not read the so-called "fine print" at the very head of the invoice,—some of which was not as "fine" as asserted. It is also amazing to this writer that disclaiming liability for the attorney's fee provision because nobody in authority bothered to read it or question its obvious implications over a two-year period falls squarely within the authorities cited in Slim Olson based on acquiescence in the terms of an agreement by silence. It is also interesting to note that on summary judgment on March 29, 1972, the trial court gave judgment for the meat delivered and accepted as per invoice ($5,576.19), together with interest for $223.00, which, according to the dates of the invoices and the prices charged to date of judgment (between four and five months) roughly *was the interest provided in the so-called "small inconspicuous print,"* which the defendant says it did not read,—and was thus immunized against its wording,—but which the trial court obviously read and enforced, —only later on to reverse himself and make the interest rate 6% instead of the 12% rate which he had adjudged. The switch, of course, was and had to be consonant with his later judgment relieving defendant of the fine print with respect to attorney's fees since the 12% rate according to the fine print then would have infected not only the defendant, but also the trial judge. All this being so,—a complete disregard of the fine print as to interest and attorney's fees, renders the entire language of the fine print paragraph unenforceable and void. This includes the parts about payment 1) "on the first Monday following the date of purchase," 2) "legal costs," 3) "expenses involved in the event legal action is necessary" for collection, and 4) payability at the place of business. Under the trial court's rejection of the fine print and this Court's affirmance, defendant would not have had to pay on the "Monday following purchase," but could pay at his leisure, perhaps six months hence, since it did not read the fine print, didn't authorize the Secretary or Treasurer to O.K. the price or make payment or anything else that did not happen to be to the liking of the President of defendant's company that received and consumed the meat and then conveniently refused to pay for it, causing the seller to resort to an expensive court action to force payment of money,—which, according to his theory, he would not have to pay except by way of quantum valebant,—a price much lower than the invoice,—simply because he had not seen the invoices and had authorized no one to buy meat or to pay for it.

**318**

Upon further analysis of the B & R case, the only authority on which defendant here relies, the court gave judgment for attorney's fees for amounts shown on invoices which the defendant personally had signed. My apology for having concurred in that case is apparent, and the fallacy that renders that case non-dispositive here, is that the trial court gave a partial judgment for attorney's fees *based on the fine print* in those instances where the defendant himself had signed the invoices, reflecting a philosophy that is quite inconsistent with reason and good sense, to the effect that if you read the fine print you are stuck; if you don't read it you're not stuck,—so the way to avoid attorney's fees or any other provision in the fine print, simply is to ignore it, permit your employees to sign delivery invoices on which are terms, that if undesirable, could be rejected, say you authorized them to sign for the delivery only but not for anything appearing on the invoices, such as weight, price, quality and the like, and you will not be responsible for any of those items, and you then can put the seller to proof dehors the invoice itself, and renege on even the delivery of goods itself by saying, for example, that your employee was not authorized to establish proof of delivery because that was reserved to the President of the corporation, who knew and saw nothing about the invoice, what was on it, or what his employee's signature looked like.